**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TRUFOOD MFG., INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| CHICAGO BAR COMPANY LLC d/b/a | ) | |
| RXBAR and PETER RAHAL, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT

Plaintiff, TruFood Mfg., Inc. ("TruFood"), through its undersigned counsel, files this Complaint against Chicago Bar Company LLC d/b/a RXBAR ("RXBAR") and Peter Rahal (together, "Defendants"), and in support thereof, states as follows:

## NATURE OF THE ACTION

1.      This action arises out of the fraudulent and willful misconduct of RXBAR and its owner and Chief Executive Officer, Peter Rahal ("Rahal").

2.      In the summer of 2017, RXBAR falsely committed to paying TruFood approximately $8.8 million to produce 94.5 million of RXBAR's specially-manufactured protein bars over the course of 2017 and 2018.

3.      RXBAR fraudulently conveyed these commitments in order to induce TruFood to: (i) make significant capital investments to retrofit existing manufacturing equipment and convert one of its production lines to accommodate RXBAR's products; and (ii) forgo valuable business opportunities from other customers resulting in substantial lost revenue.

4.      RXBAR was fully aware that its fraudulently conveyed, multi-million bar commitments were the only reason TruFood was willing to make the investments and sacrifices necessary to manufacture RXBAR's products.  RXBAR also knew that it would never fulfill its

- 1 -

commitments to TruFood due to preexisting contractual obligations RXBAR owed to another contract manufacturer, BarBakers.

5.    RXBAR engaged in this misconduct because it needed to quickly boost RXBAR's sales revenue by any means necessary.

6.    Unbeknownst to TruFood, while RXBAR was engaging in discussions with TruFood, RXBAR was also in the process of negotiating a $600 million sale to Kellogg Co. ("Kellogg").

7.    During the negotiations with Kellogg, RXBAR was unable to fulfill all its sales orders because BarBakers was operating at capacity.  RXBAR believed that if it could just ramp up production, RXBAR could sell substantially more protein bars, which would, in turn, allow it to demand a higher sale price from Kellogg.

8.    Unfortunately for RXBAR, its contract with BarBakers precluded the company from using any other contract manufacturer to supplement the production of RXBAR's products.

9.    When dealing with TruFood, RXBAR deliberately withheld from TruFood the fact that RXBAR was contractually barred from using TruFood's services under its contract with BarBakers.  TruFood would not have proceeded with the relationship had RXBAR provided this information.

10.    Instead, RXBAR told TruFood exactly what it needed to hear in order to convince TruFood to proceed with the costly process of converting its manufacturing facilities to produce RXBAR's unique, and difficult to make, products.

11.    RXBAR knew that to convince a contract manufacturer like TruFood to undertake this effort, RXBAR was going to have commit to a substantial volume of protein bars—in this case, RXBAR entered into contracts that called for TruFood to manufacture 34.5 million bars in

2017 and 60 million bars in 2018.

12.    For a short while, RXBAR lived up to its commitments, and the relationship seemed to be progressing according to plan.

13.    Then, on September 21, 2017, RXBAR abruptly ended its relationship with TruFood due to "a long lasting and strong relationship with another contract manufacturer in the industry and due to legal obligations under the existing contract with that manufacturer."

14.    Two weeks later, Kellogg issued a press release announcing that it had acquired RXBAR.

15.    Upon information and belief, RXBAR ended the relationship when it did because it had reached a deal with Kellogg and it did not want BarBakers, who had discovered RXBAR's relationship with TruFood, to create any legal issues that might derail the transaction.

16.    Adding insult to injury, Rahal is believed to have spread devastating false accusations within the food manufacturing industry regarding TruFood's supposed issues with pathogen contamination, food safety, quality standards, and financial viability.

17.    RXBAR also misappropriated TruFood's trade secret process for manufacturing RXBAR's products.  This process provided improved consistency and efficiency.  RXBAR improperly distributed information regarding this process to the other contract manufacturers of its products.

18.    Based on this conduct, TruFood files the present action asserting causes of action for breach of contract, promissory estoppel/detrimental reliance, fraudulent misrepresentation, negligent misrepresentation, misappropriation of trade secrets, and commercial disparagement.

19.    Due to the calculated, willful, and malicious nature of Defendants' misconduct, TruFood has sustained substantial injuries for which it seeks appropriate judicial relief,

including, but not limited to, the recovery of actual damages (including compensatory and consequential damages), statutory damages, punitive damages, attorneys' fees, pre- and post-judgment interest, and any additional and further relief to which it is entitled.

## THE PARTIES

20.     TruFood is a Delaware corporation with its principal place of business at 610 Alpha Drive, Pittsburgh, PA 15238.

21.     RXBAR is an Illinois limited liability company with its principal place of business at 225 W. Ohio St., Suite 500, Chicago, IL 60654.  Upon information and belief, RXBAR has two members, Rahal and Jared Smith, both of whom reside in Illinois.

22.     Upon information and belief, Rahal is an adult individual who resides in Illinois.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) in that it is between citizens of different states, and the amount in controversy exceeds the sum of $75,000.  TruFood is a citizen of Pennsylvania.  Upon information and belief, none of the members of RXBAR are citizens of Pennsylvania, and Rahal is not a citizen of Pennsylvania.

24.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because one of the claims in this action arises under the laws of the United States. This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367 because they form the same case or controversy as TruFood's claim under the laws of the United States.

25.     This Court has personal jurisdiction over Defendants because they regularly conduct business within this jurisdiction.

26.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a

substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL BACKGROUND

**A.     The Business of TruFood.**

27.     Since 1985, TruFood has been a leading contract manufacturer of private-label nutrition bars, protein bars, chocolate molded products, and baked goods.  The products TruFood manufactures are sold at club, grocery, drug, convenience, and department stores worldwide.

28.     Headquartered in Pittsburgh, TruFood employs over 600 people in Allegheny County.

29.     TruFood's business is built on its strong reputation as a safe and reliable food manufacturer.  In the food production industry, anything less than a sterling safety and quality record can be devastating to your business.

**B.     TruFood's Relationship with RXBAR.**

30.     In March 2017, RXBAR, through Rahal, approached TruFood about manufacturing its protein bars.

31.     According to RXBAR, the company was running at capacity with its existing contract manufacturer and needed assistance with production to meet increasing demand.

32.     RXBAR represented that it was concerned that it was losing sales revenue by not producing its protein bars fast enough or in sufficient quantities.

33.     TruFood was excited about the potential partnership between the two companies.

34.     In order to facilitate further discussions regarding this proposed partnership, TruFood and RXBAR executed a Mutual Nondisclosure Agreement on March 8, 2017.

35.     The Mutual Nondisclosure Agreement prohibited the use, dissemination, or disclosure of any "Confidential Information," which was defined broadly to include all of the

"confidential and/or proprietary knowledge, data or information of each of the parties in tangible or intangible form."

36.    With this agreement in place, the discussions between TruFood and RXBAR intensified.

37.    On March 24, 2017, representatives from RXBAR, including Rahal and Tom Melcher ("Melcher"), RXBAR's Chief Supply Chain Officer, traveled to Pittsburgh to meet with TruFood's executive team, and tour TruFood's facilities.  This visit was a precursor to RXBAR formally committing production volumes to TruFood.

38.    TruFood passed this initial test, and RXBAR decided to move forward with production trials designed to test TruFood's ability to manufacture RXBAR's protein bars according to RXBAR's specifications.

39.    The production trials would serve as the final hurdle for TruFood to clear before RXBAR would commit to production volumes.

40.    By May 2017, TruFood had passed these trials to RXBAR's satisfaction.

41.    Shortly thereafter, RXBAR began seriously discussing using TruFood to manufacture its bars for the remainder of 2017.

**C.    The 2017 Contract.**

42.    TruFood had some reservations about moving forward with a formal partnership. In order to accommodate production of RXBAR's products in the appropriate scale, TruFood would need to make improvements to one of its existing manufacturing lines, including adding mixing, wrapping, and testing equipment.  These improvements would be expensive.

43.    It was imperative to TruFood that RXBAR make a volume commitment significant enough to compensate TruFood for this investment.

44.    In response, Melcher offered and TruFood accepted a volume commitment of 34.5 million protein bars for the rest of 2017 (June through December).

45.    Melcher shared a monthly breakdown of the volume RXBAR needed, with smaller productions beginning in June and then ramping up through the end of the year.  This breakdown served as the basis for all planning, purchasing, production, and shipment for RXBAR's products.

46.    RXBAR and TruFood agreed that TruFood would be paid $0.092 per bar in tolling charges.

47.    To summarize, the key commercial terms of the contract for the remainder of 2017 (the "2017 Contract"), included:

- The product – RXBAR's line of specially-manufactured protein bars;

- The volume – 34.5 million bars;

- The duration – June 1, 2017 through December 31, 2017; and

- The price – $0.092 per bar in tolling, initially; raised to $0.112 in August 2017

48.    RXBAR confirmed this agreement in writing.  RXBAR further confirmed this agreement in telephone conversations, and through its conduct in accepting and paying for protein bars in quantities anticipated by the contract.

49.    With a commitment for 2017 in place, TruFood began manufacturing RXBAR's products.

**D.    The 2018 Contract.**

50.    It was not long before RXBAR wanted to increase production volumes from TruFood and extend the relationship into 2018.

51.    At the beginning of June, the parties began discussing the parameters of an

agreement for 2018.

52.    RXBAR wanted substantial additional volume from TruFood.  This additional volume would require TruFood to convert one of its existing lines to primarily run RXBAR's products.  Upgrades would also be needed.  TruFood estimated that this conversion and the upgrades would cost TruFood in excess of $600,000.  TruFood communicated these costs directly to RXBAR.

53.    Not only that, TruFood would have to prioritize RXBAR's production, thus giving up the manufacture of a significant volume of protein bars for one of its largest existing customers.

54.    Understandably, TruFood was reluctant to take such drastic steps without a corresponding commitment from RXBAR, and TruFood told RXBAR that.

55.    In response, RXBAR offered and TruFood accepted a 60 million bar commitment for 2018.

56.    With a volume commitment in place, the parties then agreed that the price for the 2018 bars would be $0.092 in tolling (this price was subsequently raised to $0.112 through agreement of the parties in August 2017).

57.    Thus, the parties had agreed to the key commercial terms of a contract covering production in 2018 (the "2018 Contract"), including:

- The product – RXBAR's line of specially-manufactured protein bars;

- The volume – 60 million bars;

- The duration – January 1, 2018 through December 31, 2018; and

- The price – $0.112 per bar in tolling

58.    With the 2018 Contract in place, TruFood then made the necessary investments.

59.    TruFood also prioritized RXBAR on the converted line, allocated production for 2018, and discounted other opportunities.  These actions had the effect of significantly damaging TruFood's relationship with an important existing customer.  In fact, that customer significantly reduced the overall volume it allowed TruFood to manufacture and further refused to allow TruFood to manufacture any of the new product lines that it was launching in 2017 and 2018.  However, as long as RXBAR lived up to its commitment, TruFood's decision would benefit the company.

60.    RXBAR knew that the only reason TruFood was willing to make the investments and sacrifices necessary for TruFood to produce RXBAR's products in larger volumes was because of RXBAR's 60 million bar commitment for 2018.

**E.    TruFood Delivers on Its Promises.**

61.    In June, TruFood manufactured and shipped 2,764,656 protein bars to RXBAR.

62.    In July, TruFood manufactured and shipped 3,004,992 protein bars to RXBAR.

63.    Before the end of July, RXBAR requested that TruFood increase its monthly production volumes over forecast for August and September.

64.    Happy with TruFood's performance, RXBAR wanted to accelerate TruFood's production schedule so that it could sell even more of its products in the marketplace and increase RXBAR's top line growth.

65.    In August, RXBAR agreed to a price increase from $0.092 per bar in tolling to $0.0112 per bar for all future bars.  This price increase was attributable to increased staffing and TruFood using slower production speeds to ensure the highest quality final product.

66.    August saw TruFood's largest production to date: 3,450,240 protein bars.

67.    From TruFood's perspective, everything was progressing according to plan.

RXBAR was consistently meeting its manufacturing commitments, and TruFood was delivering quality results.

68.     TruFood even devised a proprietary way to process the date paste used in RXBAR's protein bars that provided additional efficiencies and cost savings.

69.     However, unbeknownst to TruFood, RXBAR was deliberately misleading TruFood about its intentions in an effort to negotiate a higher sale price for a deal that RXBAR was in the midst of negotiating with Kellogg.

**F.     RXBAR Secretly Negotiates a Deal to Sell the Company to Kellogg.**

70.     Upon information and belief, while RXBAR was negotiating with TruFood, it was simultaneously engaging in talks to sell RXBAR to Kellogg.

71.     According to a published interview given by Rahal, RXBAR first learned of Kellogg's interest in buying the company in March 2017—the same month RXBAR approached TruFood.

72.     Given this interest from Kellogg, RXBAR had substantial incentive to maximize its revenues in the short term.

73.     To increase revenue, RXBAR needed to sell more of its protein bars.  It could not do that, however, because its existing contract manufacturer, BarBakers, was operating at capacity.  RXBAR tried to negotiate with BarBakers to no avail.  Given this impasse, RXBAR had to find another manufacturer to ramp up production.

74.     The problem with finding another manufacturer was that RXBAR was precluded from doing so by its contract with BarBakers, and RXBAR knew it.

75.     Rather than honor this contractual limitation, however, RXBAR decided to use TruFood as a means to artificially inflate its revenues, and leverage a larger acquisition offer

from Kellogg.  This action was willfully taken in complete disregard of the damage that it was going to inflict on TruFood.

76.     At the time the parties were negotiating their contracts, RXBAR did not disclose to TruFood that it was contractually barred from using TruFood as an additional manufacturer of its protein bars.

77.     In the end, RXBAR got exactly what it wanted. TruFood manufactured an additional 11 million protein bars from June through September for RXBAR, which resulted in an estimated increase of over $12 million in additional revenue for RXBAR in 2017.  According to its own press release, Kellogg projected net sales for 2017 to be $120 million.

78.     Based on published information, Kellogg eventually purchased RXBAR for $600 million.  Kellogg expected the multiple on projected 2018 EBITDA to be in range of 12 to 14.

79.     TruFood, however, was left holding the bag, as Defendants' actions greatly enriched themselves at the expense of TruFood.

**G.     RXBAR Abruptly Ends Its Relationship with TruFood After Finalizing the Transaction with Kellogg.**

80.     On September 21, 2017, RXBAR abruptly ended its relationship with TruFood via email.  According to RXBAR, the company had "a long lasting and strong relationship with another contract manufacturer in the industry and due to legal obligations under the existing contract with that manufacturer, RXBAR must completely discontinue our production with TruFoods [sic] for the foreseeable future."

81.     In that same email, RXBAR stressed that its decision had "no connection to performance or the recent improvement initiatives we have been working through."  Instead, the decision was "solely driven by a legal & contractual obligation which RXBAR must honor immediately."

82.     Of course, RXBAR knew all along that it had a contract with BarBakers that precluded RXBAR from using TruFood.  That contract had been executed long before RXBAR ever contacted TruFood.  RXBAR had numerous opportunities to tell TruFood about this issue when TruFood could have protected itself, but did not.

83.     Not coincidentally, just two weeks later, Kellogg issued a press release announcing that it had entered into an agreement to acquire RXBAR.

**H.    Rahal Makes Disparaging Statements Regarding TruFood and Misappropriates TruFood's Trade Secret Process for Manufacturing RXBAR's Products.**

84.     Upon information and belief, from June 2017 through the present, Rahal expressed to several of his contacts within the food manufacturing industry, including Kellogg, that TruFood has significant issues with pathogen contamination, food safety, food quality, and financial viability.

85.     The mere suggestion of the existence of these issues can have a devastating impact on a food manufacturer like TruFood.  Indeed, claiming that a food manufacturer has had significant pathogen contamination, as Rahal has done, can cause irreparable reputational damage.

86.     Due to TruFood's relationship with RXBAR, Rahal knew these claims were false when he made them.

87.     Upon information and belief, Rahal made these statements to preemptively discredit TruFood, and invent a post hoc justification for RXBAR's abrupt termination of its relationship with TruFood.

88.     Not only that, but, upon information and belief, Rahal also disclosed the proprietary process that TruFood devised for dealing with the date paste to BarBakers, so that BarBakers could manufacture higher-quality protein bars more efficiently.

89.     In April and May, during the production trials, TruFood developed a confidential, proprietary, and trade secret process for controlling water activity while manufacturing RXBAR's protein bars.

90.     Controlling for water activity during manufacturing is imperative to RXBAR—in fact, it is the critical check for finished goods.

91.     If the water content is too high, the bars are susceptible to yeast and mold contamination.  If the water content is too low, the bars do not achieve the proper texture or flavor profile.

92.     Preventing mold contamination was especially important to RXBAR because the presence of mold was the most frequent consumer complaint about its products.

93.     A repeatable process that consistently met RXBAR's specifications was extremely valuable to RXBAR.  RXBAR supplies the raw materials to its contract manufacturers, so any production batches that do not conform to specifications result in costly wasted ingredients.

94.     TruFood's process solved the consistency problems that RXBAR had previously encountered when manufacturing its bars.

95.     TruFood took reasonable steps to ensure the secrecy of this information, including, but not limited to, entering into the Mutual Nondisclosure Agreement with RXBAR, requiring its employees to enter into non-disclosure agreements, storing sensitive information on a password-protected computer system, restricting access to its manufacturing facilities, and labeling the process as confidential.

96.     RXBAR, without TruFood's permission, used this confidential, proprietary, and trade secret information regarding TruFood's manufacturing process for its own benefit.  Upon

- 13 -

information and belief, RXBAR shared this information with the other contract manufacturers with which it is affiliated.

97.    RXBAR's conduct in misappropriating TruFood's confidential, proprietary, and trade secret information has caused TruFood to suffer an unknown amount of damage.

98.    Taken together, all of Defendants' malicious conduct has caused TruFood to suffer substantial losses, including lost capital investment, lost profits, damage to its goodwill, damage to its reputation, damage to its relationships with customers and vendors, and lost business opportunities.

<u>**COUNT I**</u>
**Breach of Contract**
**(Against RXBAR)**

99.    TruFood incorporates by reference the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

100.    TruFood and RXBAR had two agreements pursuant to which TruFood would manufacture a certain amount of protein bars in 2017 and 2018 according to RXBAR's specifications, in exchange for an agreed-upon price.

101.    TruFood has fully performed its obligations under the parties' agreements.

102.    RXBAR materially breached the parties' agreements by not permitting TruFood to manufacture RXBAR's protein bars in the agreed-upon quantities or for the agreed-upon duration.

103.    RXBAR's conduct is the direct and proximate cause of damages to Trufood in an amount to be established at trial.

## COUNT II
### Promissory Estoppel/Detrimental Reliance
### (Against RXBAR)

104.    TruFood incorporates by reference the allegations set forth in paragraphs 1 through 68 as if fully set forth herein.

105.    This cause of action is being pled in the alternative to Count I.

106.    RXBAR promised TruFood that it would pay TruFood to manufacture a specific number of protein bars for RXBAR in 2017 and 2018.

107.    RXBAR breached its promises to TruFood by abruptly ending its relationship with TruFood before TruFood had an opportunity to manufacture the full amount of the protein bars.

108.    RXBAR should have reasonably expected that TruFood would rely on RXBAR's promises, and that its promises would induce TruFood to: (i) make significant capital investments in preparing its facility and manufacturing lines for the production of RXBAR's products; (ii) forfeit existing manufacturing arrangements with other companies; and (iii) not pursue similar manufacturing arrangements with other companies.

109.    In reliance on RXBAR's promises, TruFood: (i) made a significant capital investment in retrofitting and upgrading its existing manufacturing lines to accommodate the production of RXBAR's specially-manufactured protein bars; (ii) prioritized RXBAR's production over the product of other customers' products, which caused those customers to shift production to other contract manufacturers; and (iii) chose not to pursue similar manufacturing agreement with third parties pursuant to which TruFood would utilize its manufacturing capacities in exchange for monetary compensation from the third party.

110.    Injustice can be avoided only by enforcing RXBAR's promises because absent

enforcement of those promises, TruFood would be unfairly denied the benefit of receiving

monetary compensation in exchange for manufacturing food products for RXBAR or another

company.

## COUNT III
### Fraudulent Misrepresentation
### (Against RXBAR)

111.    TruFood incorporates by reference the allegations set forth in each of the

preceding paragraphs as if fully set forth herein.

112.    As set forth above, RXBAR repeatedly misrepresented to TruFood that, among

other things: (i) RXBAR was contractually permitted to use TruFood as an additional contract

manufacturer for its products; and (ii) TruFood should make a substantial capital investment in

preparing its manufacturing facility to produce RXBAR's products because RXBAR was

committed to an ongoing relationship.

113.    RXBAR knew that its misleading representations and omissions were material to

TruFood's decision-making process regarding the proposed relationship between the parties.

114.    RXBAR intended TruFood to rely on its false representations.

115.    TruFood justifiably relied upon RXBAR's false representations.

116.    RXBAR's representations were false and misleading when made because

RXBAR knew that it was precluded from using TruFood as an additional contract manufacturer,

and RXBAR had no intention of allowing TruFood to manufacture its protein bars through 2018.

117.    RXBAR made these misrepresentations in order to induce TruFood to help

RXBAR boost its revenue during its negotiations with Kellogg.

118.    As a direct and proximate result of RXBAR's fraud, TruFood has been damaged

in an amount to be proven at trial.

119.    Because RXBAR committed its actions knowingly, and in wanton and reckless disregard of TruFood's rights, TruFood is entitled to recover punitive damages in an amount to be determined at trial.

### COUNT IV
### Negligent Misrepresentation
### (Against RXBAR)

120.    TruFood incorporates by reference the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

121.    As set forth above, RXBAR repeatedly misrepresented to TruFood that, among other things: (i) RXBAR was contractually permitted to use TruFood as an additional contract manufacturer for its products; and (iii) TruFood should make a substantial capital investment in preparing its manufacturing facility to produce RXBAR's products because RXBAR was committed to an ongoing relationship.

122.    RXBAR had a legal duty to provide accurate information regarding its ability to business with TruFood.

123.    RXBAR knew or should have known that its misleading representations and omissions were material to TruFood's decision-making process regarding the proposed relationship between the parties.

124.    RXBAR intended TruFood to rely on its false representations.

125.    TruFood justifiably relied upon RXBAR's false representations.

126.    RXBAR should have known that its representations were false and misleading when made because RXBAR knew that it was precluded from using TruFood as an additional contract manufacturer, and RXBAR had no intention of allowing TruFood to manufacture its protein bars through 2018.

127.    RXBAR made these misrepresentations in order to convince TruFood to help RXBAR boost its revenue during its negotiations with Kellogg.

128.    As a direct and proximate result of RXBAR's fraud, TruFood has been damaged in an amount to be proven at trial.

## COUNT V
**Actual and Threatened Misappropriation of Trade Secrets, 18 U.S.C. § 1831, *et seq.***
**(Against RXBAR)**

129.    TruFood incorporates by reference the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

130.    This claim arises under the Defend Trade Secrets Act (the "DTSA"), 18 U.S.C. § 1831, *et seq.*, which prohibits the misappropriation of trade secrets.

131.    TruFood owns confidential, proprietary, and trade secret information for products and services used in interstate commerce.  This information provides the company with a commercial advantage because it is not generally known in the industry in which TruFood conducts business, nor is it readily ascertainable by proper means.

132.    TruFood's confidential, proprietary, and trade secret information includes, but is not limited to, a process for controlling water activity during the manufacturing process of RXBAR's protein bars.  This confidential, proprietary, and trade secret information was developed only after TruFood expended significant cost and effort.

133.    TruFood has taken reasonable steps to protect its confidential, proprietary, and trade secret information, including, but not limited to, storing its information on password-protected computers, limiting access to its manufacturing facilities, requiring all employees to sign non-disclosure agreements, and requiring business partners to sign non-disclosure agreements when appropriate.

134.    RXBAR has used improper means to misappropriate and exploit TruFood's confidential, proprietary, and trade secret information for its own advantage.

135.    RXBAR's misappropriation of TruFood's confidential, proprietary, and trade secret information has directly and proximately resulted in RXBAR and other contract manufacturers gaining an unfair business advantage in the relevant market without having to expend the effort, time, and resources required to develop such information.

136.    TruFood's trade secrets have been transferred to and maintained on RXBAR's and other third parties' computers and other devices.

137.    As a direct and proximate result of the wrongful conduct of RXBAR, TruFood has and continues to suffer damages in an amount to be determined at trial.

138.    RXBAR's conduct was willful and malicious and, on that basis, requires the imposition of exemplary damages and an award of attorneys' fees in an amount to be determined at trial.

139.    TruFood has no adequate remedy at law to compensate it for the ongoing wrongful conduct of RXBAR.  Unless enjoined, RXBAR's acts alleged herein will continue to cause TruFood irreparable harm, loss, and injury.

## COUNT VI
### Commercial Disparagement
### (Against Rahal)

140.    TruFood incorporates by reference the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

141.    Rahal published false and disparaging statements to numerous individuals in the food manufacturing industry regarding TruFood's supposed issues with pathogen contamination, food safety, food quality, and financial viability.

142.    Upon information and belief, Rahal intended the publication of such statements to cause pecuniary loss to TruFood, or reasonably should have recognized that the publication would result in pecuniary loss to TruFood.

143.    As a direct and proximate result of Rahal's conduct, TruFood has been damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, TruFood prays for entry of judgment as follows:

1.    That judgment be entered for TruFood against Defendants for all actual damages (including compensatory and consequential damages);

2.    That judgment be entered for TruFood against Defendants for punitive damages;

3.    That TruFood be awarded all available statutory damages;

4.    That this Court order RXBAR to return to TruFood any confidential, proprietary, and trade secret information belonging to TruFood, including, but not limited to, the process for controlling water activity when manufacturing RXBAR's protein bars provided to or in the possession, custody, or control of RXBAR;

5.    That this Court enjoin RXBAR from using, directly or indirectly, any of TruFood's confidential, proprietary, and trade secret information;

6.    That TruFood be awarded all of the costs and attorneys' fees it has incurred and will incur in connection with this action pursuant to any applicable statutes; and

7.    For such other and further relief that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, TruFood demands a trial by jury on all issues so triable.

Dated: February 27, 2018                  Respectfully Submitted:

                                          */s/ James P. Angelo*
                                          James P. Angelo (Pa. ID 306430)
                                          Metz Lewis Brodman Must O'Keefe LLC
                                          535 Smithfield St., Suite 800
                                          Pittsburgh, PA  15222
                                          Telephone: (412) 918-1165
                                          Facsimile: (412) 918-1199

                                          *Counsel for TruFood Mfg., Inc.*